## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **U.S. SECURITIES AND EXCHANGE COMMISSION,** 100 F. Street, NE Washington, D.C. 20549-6030 )<br><br>Plaintiff, )<br><br>v. )<br><br>**YORK INTERNATIONAL CORP.** 631 South Richland Ave. York, PA 17403 )<br><br>Defendant. ) | Civil Action No. _____ |

## COMPLAINT

Plaintiff, U.S. Securities and Exchange Commission (the "Commission"), alleges that:

### SUMMARY

1.      York International Corporation ("York International" or the "Company"), and certain of its subsidiaries, violated the anti-bribery, books and records, and internal controls provisions of the Foreign Corrupt Practices Act (the "FCPA") by making illicit payments to secure and maintain business opportunities worldwide.

2.      From 2000 to 2003, York International's Dubai subsidiary authorized and made approximately $647,110 in kickback payments in connection with its sale of humanitarian goods to Iraq under the United Nations Oil for Food Program (the "Program"). Although the payments were characterized as "after-sales service fees," no bona fide services were actually performed. The Program provided humanitarian relief to

the Iraqi population during the time that Iraq was subject to international trade sanctions. Iraq could only purchase necessary humanitarian goods and related services through a U.N. escrow account. However, the kickbacks paid in connection with York International's subsidiary's sale of goods to Iraq bypassed the escrow account and were instead paid by a third party to Iraqi-controlled accounts in countries such as Jordan. The company received approximately $931,318 in net profits for the six transactions for which it paid kickbacks.

3.    In 2003 and 2004, York International's Delaware subsidiary, York Air Conditioning and Refrigeration, Inc. ("YACR") paid approximately $522,500 to an intermediary while knowing that most of the money was intended to bribe United Arab Emirate officials to secure contracts in connection with the construction of a government-owned luxury hotel called the Conference Palace. These payments were made to influence acts and decisions by the government officials in awarding YACR lucrative contracts. Altogether, thirteen illicit payments were made on this project, ranging from $1,700 to $320,000, totaling approximately $550,000. The total amount of YACR sales revenue relating to orders on the project was approximately $3.7 million.

4.    From September 2001 through 2006, York International, through certain of its subsidiaries, made over $7.5 million in illicit payments to secure orders on certain commercial and government projects in the Middle East, India, China, Nigeria and Europe. York International's subsidiaries devised elaborate schemes to conceal kickback payments to certain individuals who had enough influence to secure contracts for York International's subsidiaries. These illicit payments were referred to internally as

2

"consultancy payments;" however, similar to the payments made under the Oil for Food Program, no bona fide services were performed.

5.      York International subsidiaries made a total of 854 improper consultancy payments on approximately 774 contracts and received approximately $8,017,814 in net profits for these contracts. Kickbacks were made on more than 302 projects involving government end-users, such as government owned companies, public hospitals or schools. Including the net profits on the Oil for Food Program transactions, York International received net profits of approximately $8,949,132 on contracts involving illicit payments.

6.      York International violated Section 30A of the Securities Exchange Act of 1934 (the "Exchange Act") by paying bribes to officials of the United Arab Emirates ("UAE") to secure business. York International failed to accurately record in its books and records the kickbacks that were authorized for payment to Iraq, the bribes in the UAE, and the illicit consultancy payments made in the Middle East, Africa, Asia and Europe in violation of Section 13(b)(2)(A) of the Exchange Act. York International also failed to devise and maintain a system of internal accounting controls to detect and prevent each of those illicit payments in violation of Section 13(b)(2)(B).

**JURISDICTION**

7.      This Court has jurisdiction over this action under Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa]. York International, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

8.    Venue is appropriate in this Court under Section 27 of the Exchange Act [15 U.S.C. § 78aa] because York International does business in this judicial district and certain acts or transactions constituting the violations by York International occurred in this district.

## DEFENDANT

9.    **York International Corporation**, a global provider of heating, ventilation, air conditioning, and refrigeration products and services, is headquartered in York, Pennsylvania. The company's common stock was registered with the Commission pursuant to Section 12(b) [15 U.S.C. § 78l(b)] of the Exchange Act and was listed on the New York Stock Exchange ("NYSE") until it was acquired by Johnson Controls, Inc. ("Johnson Controls") on December 9, 2005 and became a wholly owned subsidiary of Johnson Controls. Johnson Controls trades on the NYSE under the symbol JCI.

## RELEVANT ENTITIES

10.    **York Air Conditioning and Refrigeration, Inc.** ("YACR") was at all relevant times a Delaware corporation and was a wholly-owned subsidiary of York International. YACR has branch offices in Dubai and Abu Dhabi, United Arab Emirates. The Dubai office serves as the headquarters for York International's Middle East operations. Many of the individuals who were complicit in the Oil for Food kickbacks, the bribes to UAE government officials, and the improper consultancy payments were employees of YACR's Dubai and Abu Dhabi branches.

11.    **York Air Conditioning and Refrigeration FZE** ("York FZE") is a wholly owned subsidiary of YACR. York FZE is based in the Jebel Ali Free Zone of Dubai. York FZE was the contracting party in the Oil for Food transactions.

4

12.    **York Middle East** is the business unit within York International that is responsible for handling all Middle East business. It is not a separate corporate entity.

13.    **York Refrigeration India Ltd.** ("York India") is a corporation organized under the laws of India and is owned by York International Denmark subsidiaries. York India made certain illicit consultancy payments to secure business.

14.    **York United Kingdom ("York UK")** is a wholly owned subsidiary of York International. York UK made certain illicit consultancy payments to secure business.

15.    **York Refrigeration Marine (China) Ltd.** ("YRMC") is a subsidiary of a York International Denmark subsidiary. YRMC sells air conditioning and refrigeration equipment to shipbuilders and also to shipyards. YRMC made certain illicit consultancy payments to secure business.

## FACTS

## I.    The United Nations Oil for Food Program

16.    On August 2, 1990, the government of Iraq, under Saddam Hussein, invaded Kuwait. Four days later the United Nations Security Council voted to enact U.N. Resolution 661, which prohibited member states from trading in any Iraqi commodities or products. The United Nations continued to enforce these sanctions until 2003.

17.    On April 14, 1995, the United Nations Security Council adopted Resolution 986, which authorized the Government of Iraq to sell oil on the condition that the proceeds of all of its oil sales be deposited in a bank account monitored by the United Nations and used only to purchase designated humanitarian goods for the benefit of the

Iraqi people. In May 1996, the Government of Iraq entered into a written Memorandum

of Understanding to implement Resolution 986.

18.     The United Nations Office of Iraq Program, Oil for Food (the "Oil for

Food Program" or "Program") was subsequently established to administer Iraq's sale of

oil and purchase of humanitarian goods by Iraq. A special bank account was established

at a bank in New York (the "UN Escrow Account") to handle the transactions. The

United Nations' economic sanctions on Iraq remained in place for all trade and

transactions not authorized by the Oil for Food Program.

19.     Starting in the middle of 2000, the Iraqi government made a concerted

effort to subvert the Program by demanding secret kickbacks from its humanitarian goods

suppliers. Although contracts entered into pursuant to the Program were subject to UN

review and approval, the Program gave Iraq discretion to select the companies from

which it purchased goods. A humanitarian supplier would submit a bid for the sale of its

goods. After the Iraqi ministry would accept the bid, the ministry would inform the

supplier of the requirement that the supplier pay a secret kickback in the form of an

"After-Sales Service Fee" ("ASSF") to Iraq in order to win the contract. The Iraqi

ministry would also inform the supplier that the ASSF would have to be paid prior to the

goods entering into the country, or the goods would be stopped at the border until the

kickback was paid.

20.     Initially, when this scheme first began, suppliers met with the Iraqi

ministries in person and signed a side agreement acknowledging that the supplier would

pay the kickback.[1] By October 2000, this fee was usually ten percent of the total contract

---

[1]     The side agreement was not provided to the UN when the Oil for Food contract was submitted and approved. This was in violation of the Program and U.S. and international trade sanctions against Iraq.

value. Later in the scheme, everyone understood that the ten percent would have to be paid, thus, side agreements were no longer needed - the supplier would simply increase its original contract bid by ten percent.

21.     The supplier would then submit its contract with the inflated contract price to the UN for approval, and not disclose the ten percent kickback, which was in violation of the Program rules. The supplier would pay the ASSF to Iraq prior to shipping its goods. Afterwards, the UN Escrow Account would pay the supplier the inflated contract price for the goods, thus, unknowingly reimbursing the supplier for the ten percent that the supplier had already kicked back to Iraq. As a result of this conduct, the UN Escrow Account lost the benefit of $1 billion.

22.     After the United States invaded Iraq in March 2003, at the request of the provisional government, the UN ceased Iraq's ASSF scheme. The UN required that all pending contracts that had been inflated by ten percent be amended to reflect the true contract value of the goods.

## II.     York International's Subsidiary Makes Illicit Payments to Iraq

23.     York FZE began participating in the Program in approximately March 1999. It retained a Jordan-based consulting firm to act as its agent ("Agent") in the bidding process. The retention agreement with the Agent at that time was not formalized in writing. The consulting firm was headed by a well-connected Iraqi citizen who resided in Jordan. With the Agent's assistance, York FZE secured three contracts under the Program from March 1999 to April 2000 prior to Iraq's demand for kickbacks.

24.     On or about September 20, 2000, the Agent notified York FZE that it had been awarded its fourth contract under the Program. The contract was for the sale of air

7

conditioner compressors (the "Compressor Contract") to the Iraqi Ministry of Trade for

$1,025,800. However, shortly thereafter, the Agent informed York FZE that the Iraqi

ministries had instituted a new policy requiring companies supplying humanitarian goods

under the Program to pay an ASSF on each contract even though no after-sales services

would actually be performed.

     25.     In light of the new Iraqi policy, the Agent advised YACR's Middle East

Regional Sales Manager ("Regional Sales Manager") that the Ministry of Trade had

requested that York FZE increase its bid on the Compressor Contract it had just been

awarded in September by ten percent. In a November 7, 2000 memorandum to the

Regional Sales Manager, who was based in YACR's Dubai branch, the Agent asserted

that the Agent could facilitate the "requested 10%" by characterizing the payment as a

"performance bond." The Agent also stated that the "York Name will not be in the

middle for such agreement [sic]." Further, the Agent suggested that if York FZE did not

sign the contract including the ten percent kickback, it could adversely impact York

FZE's reputation and its ability to obtain future business under the Program.

     26.     That same day, the Regional Sales Manager responded in writing stating

that York FZE only wanted to conduct business in Iraq in full compliance with UN rules

and regulations. For unrelated reasons, the Regional Sales Manager shortly thereafter

transferred out of the office. In late November 2000, the Regional Sales Manager turned

over his responsibilities to a Dubai-based YACR area manager ("Area Manager"). On or

about November 19 and 20, 2000, the Area Manager and his supervisor, YACR Vice-

President and General Manager for the Middle East ("Vice-President"), met with the

Agent in York FZE's Dubai office.

27.     The Agent and York FZE agreed that the Agent would pay the ten percent kickback on York FZE's behalf and that the Agent's commission would be increased to cover the payment.  On or about November 19, 2000, the Agent and York FZE memorialized the agreement to increase the Agent's commission from between 3 and 4% to 13.5%.  When York FZE submitted the contract to the UN, it inflated its contract price by ten percent.  The Agent submitted an inflated invoice to York FZE, which included the ten percent kickback it paid to the Ministry of Trade on behalf of York FZE.  York FZE paid the invoice knowing the ten percent was kicked back to Iraq on its behalf and described the payment as a "consultancy" payment in its books and records.

28.     The Agent paid ASSFs on York FZE's behalf for five additional contracts under the Program.  For these contracts, York FZE submitted inflated bids to the relevant Iraqi ministries.  The Agent typically deposited the kickback payments in Jordanian banks designated by the Iraqi ministries.  The kickback payment had to be made prior to the goods being shipped to Iraq because Iraqi custom officials required proof of the kickback payment before the goods could enter the country.  Therefore, the Agent made the ASSF payment up front and was later reimbursed when York FZE received a disbursement from the UN Escrow Account.

29.     In total, the Agent paid approximately $647,110 in improper payments on behalf of York FZE.

### III.     York Middle East and Numerous Other York International Subsidiaries Devise Elaborate Schemes to Make Illicit Consultancy Payments to Secure Contracts

30.     York International, through its subsidiaries, made numerous illicit payments to secure orders on certain commercial and government projects in the Middle

East and elsewhere. York Middle East personnel in both the Dubai and Abu Dhabi branches of YACR devised an elaborate scheme to conceal kickback payments to certain individuals who could influence their customers, such as construction companies or other end-users, to choose York products for their particular project. These payments, which York Middle East internally referred to as "consultancy fees," were made to a variety of recipients, including (1) employees of the end-user; (2) employees of technical engineering firms retained by end-users to provide design services; (3) employees of contractors retained by the end-users to carry out construction; (4) employees of technical engineering firms retained by contractors or other parties; and (5) contractor firms.

31.     These consultancy payments were similar to the ASSF payments York FZE paid under the Oil for Food Program because no bona fide consulting services were actually performed and the payments were made to secure contracts.

A.     **The Mechanics of the Scheme**

32.     York International subsidiaries used a number of different mechanisms to funnel money to persons with authority to impact or secure business for the company. One mechanism involved the payment of cash. For example, in the UAE, complicit sales people employed by YACR's Dubai and Abu Dhabi branches arranged for purported contractors to generate and submit bogus invoices to York Middle East for "consulting services" that the contractors had not actually performed. Either the Dubai or Abu Dhabi branch, depending on the location of the project, paid the invoices. Afterwards, the purported contractor gave an equal amount of cash to the branch sales people less a small fee. The sales people then used the cash to pay customer-affiliated individuals to secure contracts.

10

33. A second mechanism involved either the Dubai or Abu Dhabi branch of YACR directly wiring or sending a check for payment to entities designated by customer employees based on false invoices for purported "consulting services."

34. A third mechanism used in other countries in the region, such as Egypt, Turkey and Bahrain, involved sales people (generally employees of the local York entity) arranging direct York FZE payments to be paid to consulting firms or contractors designated by customers. These payments were described as being for services rendered by these consultants and contractors in changing design specifications so that they would be more favorable to York International.

**B.**     **Bribes Paid to UAE Officials for the Conference Palace Project**

35. The Conference Palace is a major hotel and convention complex built and owned by the government of Abu Dhabi, UAE. In 2003 and 2004, the Dubai-based Area Manager who had a role in approving kickback payments under the Oil for Food Program agreed to make payments, through an intermediary ("Intermediary") to UAE government officials who had been appointed as members of the Conference Palace Hotel Executive Committee (the "Committee"). The Committee was established by a government decree, and the members of the Committee were appointed by the Crown Prince of Abu Dhabi. The Committee reported directly to Abu Dhabi's Ministry of Finance, and operated under the Ministry's direction and control. The Committee had authority to make decisions on awarding contracts to suppliers, such as YACR.

36. In March 2003, the Area Manager directed the Abu Dhabi branch to make the first payment in connection with this project to a United Arab Emirates consulting firm which employed the Intermediary. The Area Manager later arranged for twelve

11

additional payments in connection with this project. In each case, the payments were facilitated by local contractors or a distributor who agreed to submit false invoices to York Middle East. Once the invoices were paid, either a York Middle East salesman or sales manager retrieved the cash from each contractor, often times less a small fee, and passed it on to the Area Manager who then passed it on to the Intermediary for payment to the Committee members. The Vice President (who approved the kickbacks under the Oil for Food Program) and YACR's Dubai-based director of finance ("Finance Director") also approved these payments.

37.    Altogether, thirteen improper payments were made on this project, ranging from $1,700 to $320,000, totaling approximately $550,000. Approximately $522,500 was given to the intermediary while knowing that most of it was intended to bribe members of the Committee. The total amount of York Middle East sales revenue relating to orders for the Conference Palace project was approximately $3.7 million.

### C.    Abu Dhabi Residential Complex Project

38.    The Abu Dhabi residential complex project is representative of the majority of the non-government projects where illicit payments were made. On this project, YACR's Abu Dhabi branch paid the engineering consultant working on behalf of the end-user to submit technical designs that favored York equipment. Specifically, an Abu Dhabi branch sales manager arranged for a local contractor (who facilitated payments in connection with another project) to issue a false invoice to York Middle East for approximately $2,000. After receiving the invoice, the Abu Dhabi branch sent the local contractor a check for approximately $2000. The local contractor then gave the sales manager approximately $1,900 in cash. The sales manager gave the $1,900 to an

employee of an engineering firm, which the end-user had retained on the project. In turn, the employee of the engineering firm prepared design specifications that favored York equipment to ensure York would win the contract. York then secured the contract.

**D.     District Cooling Utility Project**

39.     York Middle East supplies refrigeration products to a large district cooling utility ("Utility") in the United Arab Emirates. The Utility, which is one of York Middle East's major customers in the United Arab Emirates, Bahrain and Qatar, builds "district cooling" projects that provide chilled water to sections of various cities. The Utility is a public company with shares listed on the Dubai Stock Exchange. Starting in 1997, York Middle East personnel agreed to pay a Utility senior executive ("Executive") a percentage of the revenue for all of York Middle East's Utility sales in order to secure future business. From 2000 until November 2005 when the last payment was found, York Middle East made eleven payments to entities in Europe or the West Indies that the Executive designated. The payments requested by the Executive typically amounted to seven percent of the value of York's sales on Utility projects, although it varied from nothing up to twelve percent. From 2000 to November 2005, the eleven payments to these entities ranged from approximately $15,000 to $241,500, and the total was approximately $977,000. The total amount of sales revenue associated with these payments was approximately $12.2 million.

**IV.     Illicit Payments Made Outside the Middle East**

40.     The company's widespread practice of making kickback payments to secure business was not limited to the Middle East region. York International

subsidiaries also made numerous improper payments in India, China, Nigeria, Europe, and elsewhere.

### A.    York India Makes Illicit Payments to Secure Contracts

41.    York International's Indian subsidiary, York India, retained an agent ("Indian Agent") to represent York India in connection with orders for after-installation service on equipment sold to the Indian Navy and to provide marketing and service support. An employee of the Indian Agent (who for a period was simultaneously employed by York India) admitted that while employed by the Indian Agent, he routinely made payments, in the form of cash or gifts, to Indian Navy officials to secure business. Those payments typically were less than $1,000 in value. From 2000 to 2006, these payments totaled approximately $132,500 on 215 orders. The $132,500 was taken out of the approximately $180,000 in commission payments that York India paid to the Indian Agent. The related contracts generated revenues for York India of approximately $2.4 million.

### B.    York United Kingdom Makes Illicit Payments to Secure Contracts

42.    York United Kingdom ("York UK") had two spare parts and installation projects with the Nigerian National Petroleum Corporation ("NNPC") in 2002 and 2005. York UK retained a Nigerian Agent ("Nigerian Agent") to provide site supervision and accommodations for the site engineers on the two contracts. The first NNPC order was for $770,000. In 2003, York UK paid the Nigerian Agent a $250,000 commission for its services, which was approximately 30% of the contract value. A September 2002 e-mail sent from the principal of the Nigerian Agent to a York UK manager indicates that the commission payment is being shared with an official at NNPC.

14

43.    The second NNPC order was for $1.36 million and was signed by a second York UK manager. The Nigerian Agent, which was to perform the same services it performed on the previous contract, received a $370,000 commission. Once again, the commission was approximately 30% of the contract value. The York UK manager admitted that the amount paid to the Nigerian Agent was unusually high given the services the Nigerian Agent was retained to perform. York UK has subsequently terminated its agency agreement with the Nigerian Agent and has decided not to bid on future contracts with NNPC.

**C.    York Refrigeration Marine China Makes Illicit Payments to Secure Contracts**

44.    York Refrigeration Marine (China) Ltd. ("YRMC"), a subsidiary of a York International Danish subsidiary, sells refrigeration equipment to ship builders, and also to ship yards owned by the Chinese government. From 2004 through 2006, YRMC made illicit payments to agents and other individuals, including Chinese government personnel at ship yards, without sufficient supporting documentation. The illicit payments were described as commissions, sales and marketing expenditures, or gifts and entertainment expenses. In one instance, YRMC provided Chinese ship yard employees with lap top computers and other electronics. In other cases, YRMC paid its agent hundreds of thousands of dollars for nebulous and undocumented services. All these improper payments were made to retain or maintain business. These payments were approved by the local office in Hong Kong and were processed through York International's Denmark subsidiary.

15

**D.    Total Amount of Improper Consultancy Payments**

45.    From September 2001 through 2006, York International subsidiaries made a total of 854 improper consultancy payments on approximately 774 contracts.   The improper consultancy payments totaled approximately $7,500,801.

**V.    York International Violated the Anti-Bribery Provisions of the FCPA when Its Subsidiary Paid Bribes to UAE Government Officials**

46.    York International violated Section 30A of the Exchange Act when employees of its US subsidiary, YACR, corruptly made payments through an intermediary to foreign officials of the United Arab Emirates for the purpose of obtaining or retaining business.

**VI.    York International Fails to Maintain Adequate Internal Controls**

47.    York International failed to maintain a system of internal controls sufficient to ensure that the company's transactions were executed in accordance with management's authorization and to maintain accountability for the company's assets.

48.    As evidenced by (1) the kickback payments made under the Oil for Food Program, which violated UN rules and U.S. and international trade sanctions, (2) the bribe payments to government officials in connection with the Conference Palace Hotel, (3) the widespread practice of submitting and approving fake invoices for so-called "consultants" who did not perform bona fide services; and (4) the illicit payments made by various York International subsidiaries, York International lacked internal controls sufficient to detect or prevent a variety of illicit payment schemes by certain of its U.S., Middle Eastern, European, and Asian subsidiaries.

49.    While York International had corporate policies in place to address some of these issues, the company delegated significant responsibilities to heads of geographic

regions, such as the Vice-President in the Middle East, for creating compliance controls and ensuring compliance with relevant laws, such as the FCPA. Although York International knew of endemic corruption problems in the Middle East, in particular, it appeared to take on faith, without adequate confirming steps, that the Vice President was exercising his duties to manage compliance and control issues.

50.    Further, York International knew, or had the means to easily learn, that the Middle East and other regions did not follow consistent practices with regard to performing due diligence in connection with agents and consultants. With respect to the so-called "consultants" who submitted fake invoices without performing bona fide services, no due diligence was done. Many of the agents and consultants had no written agreement with a York International subsidiary, and others signed template agreements that did not specify the consultancy services that they purportedly were providing.

51.    Local finance personnel accepted these contracts as sufficient to support payment to the purported consultants. The fake invoices from the purported consultants likewise did not adequately specify services. These contracts and invoices were false. York International's management had the ability to review or cause internal audit to review these contract files and, had this been done, it would have been immediately apparent that the consultancy arrangements were a sham. It is clear that local finance personnel did not provide an independent internal control function, but rather acquiesced in questionable practices and documentation without critical review.

52.    A 2002 internal audit of York Middle East highlighted problems with its internal controls. Specifically, the auditor noted that the internal controls "need improvement" and expressed concerns with the financial reporting function. York's 2004

self-assessment on fraud risks noted that many of York International's "historical fraud issues" had occurred at "small locations with limited segregation duties." Despite knowledge of these risks, York International's management did not take adequate steps to strengthen its anti-corruption controls in problem areas such as the Middle East, India, Nigeria and China.

53.     In sum, York International's internal controls failures are evidenced by the following: 1) the extent and duration of the illicit payments made by York International subsidiaries, 2) the involvement of multiple subsidiaries and numerous managers and employees, 3) the improper recording of these payments in York International's books and records, 4) the failure of York International's management to detect these irregularities, and 5) York International's failure to implement controls after receiving the 2002 internal audit report and 2004 self-assessment on fraud risk that highlighted the problems. As a result, York International failed to devise and maintain an effective system of internal controls to prevent or detect these violations of the FCPA, as required by Exchange Act Section 13(b)(2)(B).

## VII.    York International Fails to Maintain its Books and Records

54.     York International, through its subsidiaries, made numerous illicit payments for the purpose of obtaining contracts in the Middle East, Europe, Africa, and Asia. In the case of the Oil for Food Program kickbacks, the company's books and records did not reflect that a portion of the Agent's commission fees constituted reimbursement for kickbacks the Agent made on York FZE's behalf. Further, from 2001 through 2006, York International subsidiaries made numerous illicit consultancy payments based on false invoices in an effort to funnel money to persons to secure

business. The true nature of these payments was not disclosed in the company's books and records. Accordingly, York International failed to make and keep accurate books, records and accounts as required by Exchange Act Section 13(b)(2)(A).

### CLAIMS FOR RELIEF

### FIRST CLAIM

### Violations of Section 30A of the Exchange Act

55.     Paragraphs 1 through 54 are re-alleged and incorporated by reference.

56.     As described above, York International's subsidiary corruptly offered, promised to pay, or authorized illicit payments to a person, while knowing that all or a portion of those payments would be offered, given, or promised, directly or indirectly, to foreign officials for the purposes of influencing their acts or decisions in their official capacity, inducing them to do or omit to do actions in violations of their lawful duties, securing an improper advantage, or inducing such foreign officials to use their influence with a foreign government or instrumentality thereof to assist York International in obtaining or retaining business.

57.     By reason of the foregoing, York International violated the anti-bribery provisions of the FCPA, as codified at Section 30A of the Exchange Act [15 U.S.C. §78dd-1].

### SECOND CLAIM

### [Violations of Section 13(b)(2)(A) of the Exchange Act]

58.     Paragraphs 1 through 57 are realleged and incorporated by reference.

59.    As described above, York International, through its officers, agents and subsidiaries, failed to keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected its transactions and dispositions of its assets.

60.    By reason of the foregoing, York International violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

### THIRD CLAIM

### [Violations of Section 13(b)(2)(B) of the Exchange Act]

61.    Paragraphs 1 through 60 are re-alleged and incorporated by reference.

62.    As described above, with respect to illicit payments made in connection with the Conference Palace Project and with sales to Iraq and in other countries, York International failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (i) payments were made in accordance with management's general or specific authorization; and (ii) payments were recorded as necessary to maintain accountability for its assets.

63.    By reason of the foregoing, York International violated Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

A.    Permanently restraining and enjoining York International from violating Sections 30A, 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act  [15 U.S.C. §§ 78dd-1, 78m(b)(2)(A), and 78m(b)(2)(B)];

B.    Ordering York International to disgorge ill-gotten gains, with prejudgment

interest, wrongfully obtained as a result of its illegal conduct;

C.    Ordering York International to pay civil penalties pursuant to Section

21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

D.    Granting such further relief as the Court may deem just and appropriate.

Dated: ~~September~~ *October* _1_, 2007

Respectfully submitted,

Cheryl J. Scarboro (D.C. Bar No. *422175* )
Tracy L. Price
N. Creola Harry

Attorneys for Plaintiff,
U.S. Securities and Exchange Commission
100 F Street, NE
Mail Stop 6030 SPII
Washington, DC  20549-6030
(202) 551-4403 (Scarboro)

E 07 1750
RCL

CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

## I (a) PLAINTIFFS

U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549-6030

1100/

## DEFENDANTS

York International Corporation
631 South Richland Ave.
York, PA 17403

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT    York County
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Cheryl J. Scarboro, Tracy L. Price, N. Creola Harry
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-6030
(202) 551-4403 (Scarboro)

ATTORNEYS (IF KNOWN)

Case: 1:07-cv-01750
Assigned To : Lamberth, Royce C.
Assign. Date : 10/1/2007
Description: General Civil

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

- ◉ 1 U.S. Government Plaintiff
- ○ 2 U.S. Government Defendant
- ○ 3 Federal Question (U.S. Government Not a Party)
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ◉ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ◉ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

| ○ A. Antitrust | ○ B. Personal Injury/ Malpractice | ○ C. Administrative Agency Review | ○ D. Temporary Restraining Order/Preliminary Injunction |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Medical Malpractice<br>☐ 365 Product Liability<br>☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act<br><br>**Social Security:**<br>☐ 861 HIA ((1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g)<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)<br>**Other Statutes**<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

| ⊗ E. General Civil (Other) | OR | ○ F. Pro Se General Civil |
|---|---|---|

| **Real Property**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent, Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property<br><br>**Personal Property**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | **Bankruptcy**<br>☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**Prisoner Petitions**<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br><br>**Property Rights**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br><br>**Federal Tax Suits**<br>☐ 870 Taxes (US plaintiff or defendant<br>☐ 871 IRS-Third Party 26 USC 7609 | **Forfeiture/Penalty**<br>☐ 610 Agriculture<br>☐ 620 Other Food &Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 RR & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other<br><br>**Other Statutes**<br>☐ 400 State Reapportionment<br>☐ 430 Banks & Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation | ☐ 470 Racketeer Influenced & Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Satellite TV<br>☐ 810 Selective Service<br>☒ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 900 Appeal of fee determination under equal access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act<br><br>**No Summons Issued** |

C/FJ

| ⭘ **G.** *Habeas Corpus/ 2255* | ⭘ **H.** *Employment Discrimination* | ⭘ **I.** *FOIA/PRIVACY ACT* | ⭘ **J.** *Student Loan* |
|---|---|---|---|
| ☐ **530 Habeas Corpus-General** <br> ☐ **510 Motion/Vacate Sentence** | ☐ **442 Civil Rights-Employment** <br> (criteria: race, gender/sex, national origin, disability age, religion, retaliation) <br><br> *(If pro se, select this deck)* | ☐ **895 Freedom of Information Act** <br> ☐ **890 Other Statutory Actions** <br> (if Privacy Act) <br><br> *(If pro se, select this deck)* | ☐ **152 Recovery of Defaulted Student Loans (excluding veterans)** |

| ⭘ **K.** *Labor/ERISA (non-employment)* | ⭘ **L.** *Other Civil Rights (non-employment)* | ⭘ **M.** *Contract* | ⭘ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ **710 Fair Labor Standards Act** <br> ☐ **720 Labor/Mgmt. Relations** <br> ☐ **730 Labor/Mgmt. Reporting & Disclosure Act** <br> ☐ **740 Labor Railway Act** <br> ☐ **790 Other Labor Litigation** <br> ☐ **791 Empl. Ret. Inc. Security Act** | ☐ **441 Voting (if not Voting Rights Act)** <br> ☐ **443 Housing/Accommodations** <br> ☐ **444 Welfare** <br> ☐ **440 Other Civil Rights** <br> ☐ **445 American w/Disabilities-Employment** <br> ☐ **446 Americans w/Disabilities-Other** | ☐ **110 Insurance** <br> ☐ **120 Marine** <br> ☐ **130 Miller Act** <br> ☐ **140 Negotiable Instrument** <br> ☐ **150 Recovery of Overpayment & Enforcement of Judgment** <br> ☐ **153 Recovery of Overpayment of Veteran's Benefits** <br> ☐ **160 Stockholder's Suits** <br> ☐ **190 Other Contracts** <br> ☐ **195 Contract Product Liability** <br> ☐ **196 Franchise** | ☐ **441 Civil Rights-Voting (if Voting Rights Act)** |

**V. ORIGIN**

⊙ **1 Original Proceeding**  ⭘ **2 Removed from State Court**  ⭘ **3 Remanded from Appellate Court**  ⭘ **4 Reinstated or Reopened**  ⭘ **5 Transferred from another district (specify)**  ⭘ **6 Multi district Litigation**  ⭘ **7 Appeal to District Judge from Mag. Judge**

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

*See Attachment A    15 USC 78*

**VII. REQUESTED IN COMPLAINT**  ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   **DEMAND $** _____  Check YES only if demanded in complaint   **JURY DEMAND:**  YES ☐  NO ☒

**VIII. RELATED CASE(S) IF ANY**  (See instruction)  YES ☐  NO ☒  If yes, please complete related case form.

DATE *October 1, 2007*   SIGNATURE OF ATTORNEY OF RECORD *[signature]*

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.     COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.     CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.     CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.     CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.     RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.